IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

LAURA NEUFELDT,              )
                            )
            Plaintiff,      )
                            )
     v.                     )   Case No.
                            )   09-4109-CV-C-REL-SSA
MICHAEL J. ASTRUE, Commissioner )
of Social Security,         )
                            )
            Defendant.      )

### ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Laura Neufeldt seeks review of the final decision
of the Commissioner of Social Security denying plaintiff's
application for disability benefits under Titles II and XVI of
the Social Security Act ("the Act").  Plaintiff argues that the
ALJ erred in finding plaintiff not credible and in failing to
accord controlling weight to the opinion of plaintiff's treating
physicians, Dr. Jose Raphel and Dr. Miriam Borden.  I find that
the substantial evidence in the record as a whole supports the
ALJ's finding that plaintiff is not disabled.  Therefore,
plaintiff's motion for summary judgment will be denied and the
decision of the Commissioner will be affirmed.

### I.   BACKGROUND

Plaintiff was originally found disabled with an onset date
of February 25, 2000.  In 2004 plaintiff's benefits were
terminated.  On August 11, 2005, plaintiff applied for disability
benefits alleging that she had been disabled since May 19, 2004.

Plaintiff's disability stems from a herniated disc in her back and depression. Plaintiff's application was denied on October 7, 2005. On September 12, 2007, a hearing was held before an Administrative Law Judge. On January 24, 2008, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On April 17, 2009, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into

consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing <u>Steadman v. Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." <u>Id</u>.; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other

type of substantial gainful activity in the national economy that the plaintiff can perform.  <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000); <u>Brock v. Apfel</u>, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, <u>et seq.</u>  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.   Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.   Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.   Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.  *THE RECORD*

The record consists of the testimony of plaintiff and vocational expert Cathy Hodgson, in addition to documentary evidence admitted at the hearing.

## A.  *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

## Earnings Record

The record establishes that plaintiff earned the following income from 1980 through 2007:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1980 | $ 1,616.55 | 1994 | $      0.00 |
| 1981 | 2,407.74 | 1995 | 346.38 |
| 1982 | 466.31 | 1996 | 3,726.05 |
| 1983 | 67.00 | 1997 | 3,401.39 |
| 1984 | 6,685.04 | 1998 | 1,835.20 |
| 1985 | 1,229.31 | 1999 | 3,401.39 |
| 1986 | 462.25 | 2000 | 1,835.20 |
| 1987 | 0.00 | 2001 | 2,564.85 |
| 1988 | 393.00 | 2002 | 5,327.64 |
| 1989 | 0.00 | 2003 | 16,019.53 |
| 1990 | 1,256.74 | 2004 | 12,379.49 |
| 1991 | 0.00 | 2005 | 0.00 |

| 1992 | 19.82 | 2006 | 0.00 |
| 1993 | 0.00 | 2007 | 0.00 |

(Tr. at 77, 233).

**Function Report**

In a Function Report dated August 29, 2005, plaintiff reported that she unloads the dishwasher, vacuums or mops every other day, dusts, puts clothes in the washer, moves clothes from the washer to the dryer, puts clothes away, picks up around the house, prepares meals, and exercises twice a day (Tr. at 258). She reported that she did "everything" for her then 17-month-old grandson (Tr. at 259). She took care of two dogs including feeding them, getting them water, brushing them, and letting them in and out of the house (Tr. at 259). She had no problem with personal care (Tr. at 259), needed no reminders to take care of personal needs or medicine, was able to prepare her own meals daily for 30 to 45 minutes at a time, and did "all the cleaning" (Tr. at 260).

She reported that she sometimes goes out two or three times a day, can drive or ride in a car, is able to go out alone, is able to shop once a week for an hour at a time, surfs the internet, sews, and draws (Tr. at 261-262). When asked to describe how any of these activities had changed since her alleged onset of disability, plaintiff wrote, "Can not afford

supplies for sewing and drawing" (Tr. at 262).  When asked if someone needs to accompany plaintiff when she goes places, she checked, "no" (Tr. at 262).  When asked if she has any problems getting along with family, friends, neighbors, or others, she checked, "no" (Tr. at 263).  When asked to circle all of the abilities her condition has affected, plaintiff circled lifting, squatting, bending, standing, walking, sitting, kneeling, and stair climbing (Tr. at 263). She did not circle reaching, memory, completing tasks, concentration, understanding, following instructions, using her hands, or getting along with others (Tr. at 263).  She wrote that she can lift 30 pounds, stand in place for ten minutes, walk up to 30 minutes, sit for as long as she wants as long as she changes positions often, and go up stairs very slowly (Tr. at 263).  She said she could pay attention, "as long as needed" (Tr. at 263).  She finishes what she starts, and she has no problems following written or spoken instructions, and she has no problems getting along with authority figures (Tr. at 263-264).

Plaintiff noted that she does not handle stress well (Tr. at 264). She noted that "it takes time to get used to changes [in routine], but I think I handle it fine." (Tr. at 264).

## B. SUMMARY OF MEDICAL RECORDS

On June 30, 2005, David Mook, M.D., ordered an x-ray of plaintiff's cervical spine and a magnetic resonance imaging ("MRI") scan of her lumbar spine (Tr. at 314-15). The x-ray results were normal (Tr. at 314). The MRI revealed partial lumbarization of S1, disc desiccation at L4-5 and L5-S1 with no evidence of central canal or neural foraminal stenosis, and minimal broad-based disc bulge at L5-S1 with moderate right foraminal stenosis, but no central canal or left foraminal stenosis (Tr. at 315). Dr. Mook prescribed ibuprofen and Skelaxin (a muscle relaxer) (Tr. at 314).

On July 13, 2005, Dr. Mook noted plaintiff's x-ray results were "totally normal" (Tr. at 305, 314). Plaintiff reported a neurosurgeon advised her that she could not undergo spine surgery unless she stopped smoking cigarettes (Tr. at 305). Plaintiff stated she wanted to try conservative measures rather than surgery (Tr. at 305). Dr. Mook's physical examination of plaintiff revealed normal range of motion in her neck and "absolutely full" range of motion in her back, although she straightened slowly (Tr. at 305). He recommended plaintiff undergo physical therapy, discontinue smoking, and continue with her current medications (Tr. at 305). Plaintiff told Dr. Mook she was "interested in finding work" (Tr. at 305).

Plaintiff attended physical therapy on July 18, 2005 (Tr. at 312). Physical Therapist Mandy Schlesselmann noted that plaintiff's rehabilitation potential was "good minus" and expected that after three weeks of physical therapy she would have normal extension and flexibility, would return to her prior activities, and would be independent with a home exercise program (Tr. at 313).

On August 24, 2005, plaintiff reported to Dr. Mook that she had fallen while "standing on the side of the tub painting," but her back pain was resolving (Tr. at 302). Dr. Mook noted that plaintiff's back had been "doing relatively well" prior to her fall (Tr. at 302). Plaintiff reported she smoked one and one-half packs of cigarettes per day (Tr. at 302). She reported insomnia, feeling "blue," and various stressors from her health and family (Tr. at 302). Dr. Mook prescribed Cymbalta (an anti-depressant) (Tr. at 302).

On September 12, 2005, Thomas Folz, M.D., performed needle electromyography and nerve conduction studies on plaintiff's arms (Tr. at 299-300). The results were normal (Tr. at 299).

On October 7, 2005, Elissa Lewis, Ph.D., a State agency non-examining psychological consultant, reviewed plaintiff's mental health records and determined that she had no severe impairment (Tr. at 318). Dr. Lewis determined that plaintiff had an

affective disorder (Tr. at 318, 321). She found that plaintiff had no restrictions of activities of daily living; no difficulties maintaining social functioning; no difficulties maintaining concentration, persistence, and pace; and no episodes of decompensation of extended duration (Tr. at 328). Dr. Lewis also found that the evidence did not establish the presence of the "C" criteria (Tr. at 329).

On December 18, 2006, Jose Raphel, M.D., a psychiatrist, evaluated plaintiff for complaints of anxiety (Tr. at 352). Plaintiff reported feelings of hopelessness, worthlessness, helplessness, and several stressors related to her family (Tr. at 352). She reported being tense, sad, stressed, lonely, and angry, with low energy and poor concentration (Tr. at 352). Dr. Raphel diagnosed depressive disorder and partner relational problems (Tr. at 353). He assessed a Global Assessment of Functioning ("GAF") score of 54[1] and prescribed Cymbalta (Tr. at 353).

On January 8, 2007, plaintiff reported to Dr. Raphel that her depressive symptoms had improved, but she still had panic attacks (Tr. at 351). Dr. Raphael noted that she was pleasant

---

[1]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

and cooperative, and plaintiff's mental status examination was within normal limits (Tr. at 351). Dr. Raphel continued plaintiff on Cymbalta and Xanax (treats anxiety) (Tr. at 351).

On February 1, 2007, plaintiff reported to Dr. Raphel that although she experienced occasional panic attacks, her depressive symptoms and anxiety had improved greatly with her medications and she was not experiencing side effects (Tr. at 346). Dr. Raphel observed that her mood was "brighter" and her mental status examination was within normal limits (Tr. at 346).

On March 1, 2007, plaintiff reported increased depression symptoms to Dr. Raphel, and he increased her Cymbalta dosage (Tr. at 345). He noted she was oriented times three, pleasant, and appropriate (Tr. at 345). Plaintiff also reported radiculating pain in both legs (Tr. at 345).

On March 29, 2007, plaintiff reported to Dr. Raphel that she was having a "good response" to her present medications and was not experiencing any side effects (Tr. at 344). He noted her mental status examination was within normal limits and continued her medications (Tr. at 344).

On April 26, 2007, Dr. Raphel continued plaintiff's medications after she reported responding well to her present medications without side effects (Tr. at 343). He noted her "bright" mood, and indicated that her mental status evaluation

was within normal limits (Tr. at 343).  She told him Neurontin[2] helped her leg pain (Tr. at 343).

On May 31, 2007, plaintiff reported to Dr. Raphel that she was responding "very well" to Cymbalta (Tr. at 342).  Her mental status examination was within normal limits (Tr. at 342).

On June 1, 2007, plaintiff told Joshua Griggs, M.D., a treating primary care physician, that she had pain in her legs, back, arms, hips, knees, and shoulders (Tr. at 373).  She told him her mood was under good control with Cymbalta (Tr. at 373).  Dr. Griggs diagnosed multiple bone pains, multiple arthralgias (joint pain), and anxiety and depression, currently controlled with Cymbalta (Tr. at 374).  Due to her reports of neck pain, Dr. Griggs ordered x-rays of plaintiff's cervical spine (Tr. at 364).  The results were unremarkable (Tr. at 364).

On June 15, 2007, plaintiff reported to Dr. Griggs continuing pain in her legs, back, arms, and neck (Tr. at 371).  He referred plaintiff to rheumatology (Tr. at 371).  Dr. Griggs noted that plaintiff was very reluctant to stop smoking cigarettes because of possible weight gain (Tr. at 371).

In an undated record, plaintiff reported to Dr. Raphel her depressive symptoms were returning after she had been out of

_____

[2]Neurontin is an anti-seizure medication sometimes used to relieve pain for certain conditions in the nervous system.

Cymbalta for two weeks (Tr. at 341). He prescribed Cymbalta (Tr. at 341).

On July 19, 2007, Dr. Raphel completed a Mental Medical Source Statement ("MSS") (Tr. at 335-37). In the form, he indicated that plaintiff had difficulties with changes in the work setting; maintaining persistence and pace; and getting to work regularly and staying for a full day (Tr. at 335). Dr. Raphel found that she was "moderately limited" in her abilities related to understanding and memory (Tr. at 335). He found that she could carry out very short instructions, make simple decisions, and sustain an ordinary routine, but was "moderately limited" in her other abilities related to sustained concentration and persistence (Tr. at 336). Dr. Raphel indicated plaintiff's ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes was "moderately limited," but other social interaction abilities were "not significantly limited" (Tr. at 336). He found that her adaptation abilities were "moderately limited" (Tr. at 337).

Miriam Borden, M.D., a rheumatology specialist, indicated in a letter dated August 17, 2007, that plaintiff's physical examination revealed "benign general findings" (Tr. at 357). Her examination showed crepitus[3] and reproducible pain with applied

---

[3]A clinical sign in medicine characterized by a peculiar crackling, crinkly, or grating feeling or sound under the skin,

pressure on the right thumb (Tr. at 357). Sixteen tender points were elicited, and Dr. Borden diagnosed fibromyalgia (Tr. at 357). She recommended aqua therapy, Lyrica (treats fibromyalgia), and a "good muscle relaxant with sedating properties (i.e., cyclobenzaprine) for a better night's sleep." (Tr. at 357).

On August 22, 2007, Dr. Griggs's examination of plaintiff elicited eight of 12 tender points (Tr. at 370). Plaintiff reported improved sleep and less severe and frequent leg pain (Tr. at 370).

On August 30, 2007, Dr. Raphel noted plaintiff responded well to the Cymbalta with no side effects (Tr. at 340). He stated that her mental status examination was essentially within normal limits (Tr. at 340). Plaintiff reported her rheumatologist had diagnosed fibromyalgia and placed her on Lyrica with "excellent results" (Tr. at 340).

On September 6, 2007, Dr. Borden found that plaintiff could lift and carry 25 pounds occasionally and ten pounds frequently, stand or walk for one hour at a time and four hours total and sit for three hours at a time and eight hours total during an eight-

---

around the lungs, or in the joints. Crepitus in soft tissues is often due to gas, most often air, that has penetrated and infiltrated an area where it should not normally be, as for example the soft tissues beneath the skin (a condition called subcutaneous emphysema). Crepitus in a joint can represent cartilage wear in the joint space.

hour work-day, provided she was allowed to alternate between sitting and standing (Tr. at 379).  She could occasionally climb, balance, stoop, kneel, crouch, and bend (Tr. at 379).  She had no manipulative, environmental, or push and pull limitations.

On October 4, 2007, on a form sent by the ALJ, Dr. Raphel noted that plaintiff could not understand, remember, and carry out even simple tasks or routines, or make even simple work-related decisions without excessive increased supervision, within normal tolerances on a sustained basis (Tr. at 384).  His opinion was based on his treatment of plaintiff for depression and anxiety (Tr. at 384).  He noted that she felt sad, hopeless, helpless, and worthless, and reported poor concentration, anger, and decreased energy with anhedonia[4] and insomnia (Tr. at 384). He found that she could not respond appropriately to supervision, co-workers, and usual work situations, or deal with routine changes in even a simple work setting within normal tolerances on a sustained basis because of depression and anxiety (Tr. at 385). When asked to list the clinical signs, findings, test results or other non-subjective basis on which he relied to support his conclusions, Dr. Raphel wrote:

> The patient is being seen for treatment of depression and anxiety.  She has experienced sadness, feelings of

---

[4]The inability to gain pleasure from enjoyable experiences.

hopelessness, helplessness and worthlessness.  She has also reported poor concentration, anger and decreased energy with anhedonia and insomnia.

Jennifer Boyer Stevens, Psy.D., a clinical psychologist, performed a consultative examination of plaintiff on November 12, 2007 (Tr. at 386-89).  Plaintiff told Dr. Stevens she experienced chronic pain and related difficulties with tearfulness, loss of appetite, loss of interest in previously enjoyable activities, and feelings of panic when in public (Tr. at 386-87).  Plaintiff stated journal writing and smoking 30 cigarettes per day relieved her stress (Tr. at 387-38).  She stated she was able to care for her grandson, watch television, cook meals, and provide transportation for her son (Tr. at 387).

Dr. Stevens found that plaintiff was of average intelligence, could apply insight and social skills, had adequate memory and mental control and adequate pace and persistence (Tr. at 388).  She diagnosed mood disorder due to chronic pain, but found that plaintiff's emotional symptoms did not restrict her activities (Tr. at 387, 389).  She assessed a GAF score of 60, indicating mild symptoms (Tr. at 389).

In addition to evaluating plaintiff's mental status, Dr. Stevens completed the same form given to Dr. Raphel by the ALJ (Tr. at 390).  She found that plaintiff could understand, remember, and carry out even complex tasks or routines, or make

even complex work-related decisions without excessive increased supervision, within normal tolerances on a sustained basis (Tr. at 390). She found that plaintiff could deal with routine changes and respond appropriately to supervision, co-workers, and usual work situations in simple, moderately complex, or complex work settings within normal tolerances on a sustained basis (Tr. at 390).

## C. *SUMMARY OF TESTIMONY*

During the September 12, 2007, hearing, plaintiff testified; and Cathy Hodgson, a vocational expert, testified at the request of the ALJ.

## 1. **Plaintiff's testimony.**

Plaintiff received Social Security disability in the past due to a lower back injury (Tr. at 411). Plaintiff had had back surgery but the pain came back because she was in a car accident three weeks after her back surgery (Tr. at 412). One year after her back surgery, she lost everything she had in a fire (Tr. at 412). A few months after that fire, plaintiff learned that her husband was molesting her daughter (Tr. at 412). She has not been able to "put it together" since then (Tr. at 412).

Plaintiff applied for Social Security disability in 1997 but was denied (Tr. at 413). After a hearing before an administrative law judge in December 2000, she was found disabled

(Tr. at 413). She received between $300 and $340 per month in benefits until mid-2004 (Tr. at 413). Plaintiff then started working in a warehouse and she did fine with working four hours, taking an hour-long lunch break, and working four more hours (Tr. at 414). Then the company got behind and required the workers to give up their lunch breaks (Tr. at 414). Plaintiff injured her back that day and went home early (Tr. at 414). The next morning she could not get out of bed (Tr. at 414). This occurred approximately May 19, 2004 -- about the same time her initial benefits were terminated (Tr. at 414). At the time of the administrative hearing, plaintiff was having continued issues with her back (Tr. at 415). Some days she was able to get up fine but other days she would suffer sharp pains that would shoot into her legs and arms (Tr. at 415). Sometimes her pain is so sudden that it knocks her down (Tr. at 415). She also experiences intense migraines (Tr. at 415). Plaintiff was diagnosed with fibromyalgia about three weeks before the hearing (Tr. at 415-416). Medicaid will not pay for her medication and she cannot afford it, so she takes Ultram instead of what he doctor originally prescribed (Tr. at 417).

On a typical day, plaintiff can sit for 30 minutes before needing to move around; she can stand to do dishes for about ten minutes at a time before having to sit down for about 20 minutes

(Tr. at 418).  Plaintiff would take her three-year-old grandchild to the park but would need to sit down after pushing him in the swing four or five times (Tr. at 418).  About three days a week, plaintiff's pain will be so bad that she has to lie down for about two hours during the day (Tr. at 418).  Plaintiff cannot bend over due to her back pain (Tr. at 419).  She cannot kneel due to knee pain (Tr. at 419).  Plaintiff wears a brace on her left wrist due to wrist pain (Tr. at 420).

At the time of the administrative hearing, plaintiff was 43 years of age and is currently 46 (Tr. at 407).  She went to school through tenth grade, got a GED, and then attended college for a year (Tr. at 407).

Plaintiff testified that she was living with her three-year-old grandson, her 17-year-old son, and her boy friend (Tr. at 407).  Plaintiff's boy friend was employed (Tr. at 407).  She had Medicaid, and her only income was $275 per month in child support income (Tr. at 407).

Plaintiff previously worked as a receptionist and lost that job because she missed nine days of work in two months due to her son's separation anxiety (Tr. at 408).  Plaintiff previously worked as a delivery driver and as a warehouse worker doing order filling (Tr. at 409).  She left that job when she re-injured her back (Tr. at 409).  Plaintiff's last job was for Lake's Country

(Tr. at 410). She worked there for three weeks about four hours
per day and then had a mental breakdown (Tr. at 410). Plaintiff
would go to work and cry (Tr. at 430). She was having fights at
home with her son and her boy friend at the time (Tr. at 430).
One day she went into work on a Friday and "said, That's it. I
can't do this anymore, and I left." (Tr. at 430). The thought of
having a job interview makes plaintiff not even fill out job
applications (Tr. at 430).

Plaintiff cries "at the drop of a hat" and for no reason
(Tr. at 421). She spends most of her evenings crying and does not
know why (Tr. at 421). Plaintiff rarely goes places alone due to
anxiety (Tr. at 421-422). If she has to go to Wal-Mart, she will
take a Valium before driving there with her grandchild (Tr. at
422). About three or four times a week, plaintiff will try to go
somewhere but then cannot make herself get out of the car (Tr. at
422). If she needs to get gas, she will have her son come with
her because she cannot make herself go inside to pay -- she gets
very nervous and scared and starts crying (Tr. at 423). About
three days a week, plaintiff will stay in her pajamas; and many
days she does not want to get out of bed, but she does because of
her grandchild (Tr. at 427). Plaintiff believes she has been
suffering from depression since she had back surgery in 1994,
although it was only diagnosed about a year before the hearing

(Tr. at 423-424).  Plaintiff was taking Cymbalta for her depression and it seemed to be helping (Tr. at 426).

When asked how she spends her day, plaintiff said, "the three-year-old keeps me busy" (Tr. at 430).  She watches television with him, plays card games, and takes him to the park about twice a week (Tr. at 431).  Plaintiff sweeps the floor and gets the laundry started -- she puts it in the washer, someone else puts it in the dryer and takes it out so that plaintiff can fold it and put it away (Tr. at 432).  Plaintiff does most of the cooking (Tr. at 432).  "I do a lot of sitting." (Tr. at 432).  In a typical week, plaintiff drives about 80 miles (Tr. at 433).  She takes her son to work and drops her grandchild off at preschool (Tr. at 433).  Plaintiff was able to drive three hours to Overland Park, Kansas, and stayed for two days (Tr. at 434).  Her son and grandson went with her (Tr. at 434). Plaintiff sews about twice a month (Tr. at 434).

## 2.  Vocational expert testimony.

Vocational expert Cathy Hodgson testified at the request of the Administrative Law Judge.

The first hypothetical involved a person limited in the manner described by plaintiff in her testimony (Tr. at 436).  The vocational expert testified that such a person could not work (Tr. at 436).

The second hypothetical involved a person limited in the manner described by Dr. Bordon, i.e., could frequently lift ten pounds; occasionally lift 25 pounds; stand or walk for a total of four hours per day and one hour at a time; sit for a total of eight hours per day and three hours at a time; would need to have a sit/stand option; and could occasionally climb, balance, stoop, kneel, crouch, or bend (Tr. at 378-381, 436-437). The vocational expert testified that such a person could perform plaintiff's past relevant work as a receptionist (Tr. at 437).

The third hypothetical involved a person limited in the manner described by Dr. Raphel, i.e., an inability to deal with changes in a routine work setting, maintain persistence and pace on simple tasks, and get to work regularly and remain at the workplace for a full day, among other limitations (Tr. at 335-337). The vocational expert testified that a person with these three limitations would be able to do no work (Tr. at 438). The vocational expert was unable to offer a definitive opinion as to the rest of the form because the extent of limitations was not defined (Tr. at 439-440).

The next hypothetical involved a person with the same physical limitations as those described in the second hypothetical and who could pay attention well enough to sustain a simple routine or simple repetitive tasks as long as there was no

need for a high level of concentration, no requirement for sustained precision or sustained attention to detail, and the work was not high stress such as fast paced activity or work that requires a person to adapt or deal with changes in the work setting (Tr. at 440-441). The vocational expert testified that such a person could not work as a receptionist because that is a semi-skilled position (Tr. at 441). However, the person could work as an addresser, D.O.T. 209.587-010 with 121,000 in the country and 2,300 in the region, or could be a surveillance system monitor, D.O.T., 379.367-010 with 36,000 in the national and 6,000 in the region (Tr. at 441).

The next hypothetical added the limitation that the person needs to avoid frequent or prolonged personal interaction with the public and co-workers (Tr. at 444). The vocational expert testified that such a person could still perform the positions of addresser and surveillance system monitor (Tr. at 444).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge David Fromee entered his opinion on January 24, 2008 (Tr. at 18-28). Plaintiff's last insured date is March 31, 2009 (Tr. at 18).

Step one. Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 20).

Step two.  Plaintiff suffers from the following severe
impairments:  degenerative disc disease of the lumbar spine,
fibromyalgia, and mood disorder secondary to physical condition
(Tr. at 20).  Her carpal tunnel syndrom and chronic obstructive
pulmonary disease are non-severe impairments (Tr. at 20).
Plaintiff's mental impairment results in mild restriction of
activities of daily living; moderate difficulties in maintaining
social functioning and moderate difficulties in maintaining
concentration, persistence or pace; and has resulted in no
episodes of decompensation of extended duration (Tr. at 21).

Step three.  Plaintiff's impairments do not meet or equal a
listed impairment (Tr. at 21).

Step four.  Plaintiff retains the residual functional
capacity to lift and carry ten pounds frequently and 25 pounds
occasionally; sit for three hours at a time and eight hours per
day; stand or walk for an hour at a time and four hours total per
day; must be able to alternate sitting and standing; may push and
pull without limitation; may occasionally climb, balance, stoop,
kneel, crouch, or bend; may reach, handle, finger, feel, see,
hear, and speak without limitation; has no environmental
restrictions; can maintain the level of attention required for
routine, repetitive tasks, but is unable to sustain a high level
of concentration or to sustain precision or attention to detail;

and is unable to perform high-stress work such as fast-paced activity or work involving changing work settings (Tr. at 21-22). With this residual functional capacity, plaintiff cannot return to her past relevant work (Tr. at 26).

Step five.  Plaintiff can perform the sedentary unskilled jobs of addresser (D.O.T. 209.587-010) with 2,300 in the state of Missouri and 121,000 in the country or surveillance system monitor (D.O.T. 379.367-010) with 6,000 in the state of Missouri and 36,000 in the country (Tr. at 27).

## VI.  CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

### A.  CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988);  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v.

<u>Sullivan</u>, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ
explicitly discredits testimony and gives legally sufficient
reasons for doing so, the court will defer to the ALJ's judgment
unless it is not supported by substantial evidence on the record
as a whole.  <u>Robinson v. Sullivan</u>, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit
plaintiff's subjective complaints is supported by substantial
evidence.  Subjective complaints may not be evaluated solely on
the basis of objective medical evidence or personal observations
by the ALJ.  In determining credibility, consideration must be
given to all relevant factors, including plaintiff's prior work
record and observations by third parties and treating and
examining physicians relating to such matters as plaintiff's
daily activities; the duration, frequency, and intensity of the
symptoms; precipitating and aggravating factors; dosage,
effectiveness, and side effects of medication; and functional
restrictions.  <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir.
1984).  Social Security Ruling 96-7p encompasses the same factors
as those enumerated in the <u>Polaski</u> opinion, and additionally
states that the following factors should be considered:
Treatment, other than medication, the individual receives or has
received for relief of pain or other symptoms; and any measures
other than treatment the individual uses or has used to relieve

pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

At the hearing, the claimant testified that she is unable to work due to back pain that radiates to the arms and legs and due to migraine headaches. She added that she has been diagnosed with fibromyalgia. She stated that she is able to sit for 30 minutes and then must stand for 10 minutes. She stated that she must lie down for 2 hours on a "bad day," and that bad days occur about 3 times a week. She added that she is unable to bend or kneel because of pain, but that she can sometimes stoop. The claimant testified that in addition to her back disorder, she has left wrist pain and osteoarthritis of the right thumb and is "sad" and "emotional." She added that she wears a brace on her left hand/wrist, but that she is right-hand dominant. She stated that she has been told that she "has depression and anxiety." She testified that, because of anxiety, she has difficulty going places alone and has "pulled away" from friends and that, because of depression, she cries frequently and does not want to get out of bed. However, she does in fact get out of bed for the sake of her 3 year old grandson, who lives with her, and that she is able to do things such as take him to a park. She stated that her other daily activities are watching television, playing card games, sweeping floors, doing laundry, cooking, sewing, taking her 17 year old son to work and picking him up there and taking the 3 year old to pre-school. She added that the grandson "keeps [her] busy" and that in the past year she had made a 3 hour trip to Overland Park, Kansas, with her son and grandson and stayed there for 2 days.

The medical evidence shows that the claimant has a history of complaints of back and upper and lower extremity pain. However, electromyographic and nerve conduction studies of her upper extremities done in September 2005 were normal as were x-ray studies of her cervical spine done in June of that year and in June of 2007. An MRI study of her lumbar spine performed in June 2005 revealed partial lumbarization

27

of Sl; disc desiccation at L4-5 and L5-Sl; mild to moderate
disc space narrowing at L5-Sl; a minimal broad-based disc
bulge at L4-5, with no evidence of central canal or neural
foraminal stenosis; and a minimal broad-based disc bulge at
L5-S1, with moderate right foraminal stenosis, but no
central canal or left foraminal stenosis.  She was
prescribed ibuprofen and Skelaxin in June 2005.

David Mook, M.D., saw the claimant on July 13, 2005.  He
noted that she had been evaluated by a neurosurgeon and
advised that she could not undergo spine surgery unless she
stopped smoking cigarettes, but that she continued to smoke
1 1/2 pack[s] per day.  Dr. Mook recommended that the
claimant receive a 3 week course of physical therapy and
continue with her current medications.  He additionally
noted that she told him that she was "interested in finding
work."  In August 2005, the doctor noted that the claimant
reported that she had fallen while "standing on the side of
the tub painting" and that this had caused increased back
pain and muscle spasms but that these symptoms were
resolving.

* * * * *

. . .  The claimant also told the doctor that she was able
to care for her grandson, watch television, cook meals and
provide transportation for her son.  Dr. Stevens found no
significant abnormality on examination.  She opined that the
claimant had emotional symptoms related to pain, but that
these symptoms did not restrict her activities.  She added
that her assessment indicated that the claimant was of
average intelligence, was able to apply insight and social
skills, had adequate memory and mental control and had
adequate pace and persistence.  The doctor diagnosed mood
disorder due to chronic pain and opined that the claimant
had a Global Assessment of Functioning score of 60,
indicating that her symptoms were mild.

After considering the evidence of record, the undersigned
finds that the claimant's medically determinable impairments
could reasonably be expected to produce the alleged
symptoms, but that the claimant's statements concerning the
intensity, persistence and limiting effects of these
symptoms are not entirely credible.

In completing a Social Security Administration questionnaire as part of the application for benefits, the claimant stated that she was able to "do everything" for her grandson (including preparing his meals, feeding him, changing his diapers and playing with him), do laundry, vacuum and mop, tidy and clean her residence, prepare meals for herself and the other adults in the household, exercise, care for 2 dogs, drive and ride in a car, go out alone, shop for groceries, manage her finances, watch television, use a computer, spend time sewing and drawing and talk on the telephone with family members. She further stated that she had no difficulty getting along with other people, maintaining attention or following instructions. These statements (which contradict her hearing testimony to some extent), together with her statements to Dr. Stevens and Dr. Mook, show that she engages in a normal range of daily activities and are inconsistent with her allegation that she is disabled. In particular, the claimant's acknowledgment that she is able to care for a young child without assistance shows that she retains the capacity for considerable physical and mental exertion.

The medical records, moreover, do not support the claimant's allegation of disability. The claimant has a history of complaints of pain and has been diagnosed with lumbar degenerative disc disease and fibromyalgia, but examinations and imaging studies produced no evidence of any abnormality so serious that it could reasonably be expected to produce the extreme symptomatology she describes. No doctor who treated the claimant for her physical impairments opined that she is unable to work. With regard to the claimant's physical functional limitations, the undersigned has given substantial weight to the opinion of Dr. Borden, her treating rheumatologist. The claimant also has a history of complaints of depression and anxiety. These conditions restrict her work-related mental functioning to some extent, but has given little weight to the opinions of Dr. Raphel that her mental condition is disabling because the opinions are internally inconsistent and inconsistent with the other medical evidence of record, including the opinion of Dr. Stevens, Dr. Raphel's own observation that the claimant responded well to Cymbalta and the claimant's statement to Dr. Griggs that her mood was under good control with that medication.

\* \* \* \* \*

29

Finally, the Administrative Law Judge notes that that [sic] claimant's Social Security Administration earnings record shows that her earnings before the date on which she states she became unable to work were sporadic and generally very low. This indicates that she was not strongly motivated to engage in productive activity even prior to the alleged onset of disability and also weighs against her credibility.

(Tr. at 22-26).

## 1.   PRIOR WORK RECORD

As the ALJ pointed out, plaintiff's earnings record does not reflect a strong motivation to work prior to her alleged onset of disability. In five years prior to her alleged onset date, plaintiff had no earned income. One year she earned $19.82; another year she earned $67.00. The year of plaintiff's alleged onset of disability was the second-highest earnings year of her life. In all but four years out of the 25 years spanning plaintiff's employment history, she earned less than $4,000. This factor supports the ALJ's credibility finding.

## 2.   DAILY ACTIVITIES

In a function report completed more than a year after plaintiff's alleged onset date, plaintiff reported that she was unloading the dishwasher, vacuuming or mopping every other day, dusting, putting clothes in the washer, moving clothes from the washer to the dryer, putting clothes away, picking up around the house, preparing meals, exercising twice a day, doing "everything" for a 17-month old child, doing all the cleaning,

going out two or three times a day, shopping for an hour at a
time, surfing the internet, sewing, and drawing.  When asked how
her activities had changed since her alleged onset of disability,
plaintiff reported only a lack of funds with which to purchase
her sewing and art supplies.  That same month, plaintiff reported
to her doctor that she had been standing on the side of the tub
painting.  Plaintiff testified that she had been able to drive
for three hours to Overland Park, Kansas, where she stayed for
two days before returning.

These daily activities are entirely inconsistent with the
limitations plaintiff described in her testimony and are
inconsistent with disability.  This factor supports the ALJ's
credibility determination.

### 3. *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS*

In a Function Report completed more than a year after
plaintiff's alleged onset of disability, she was asked to circle
all of the abilities affected by her condition.  She did not
circle reaching, memory, completing tasks, concentrating,
understanding, following instructions, using her hands, or
getting along with others.  She indicated that she could lift 30
pounds (which is more than that found by the ALJ), and sit as
long as she wants as long as she is able to change positions
(again, for longer than that found by the ALJ).  These reports

are inconsistent with the intensity of symptoms described by plaintiff in her testimony during the hering.

Plaintiff was told that she could not undergo surgery for her back pain unless she stopped smoking; she stated she would rather try conservative measures, indicating that her back pain was not all that severe. Several years later, plaintiff indicated that she was "very reluctant" to stop smoking cigarettes, despite continuing to report pain. Once again, choosing to smoke cigarettes rather than undergo possible treatment for her pain indicates that plaintiff's pain was not as severe as she testified.

Plaintiff's application for benefits was denied on October 7 2005. More than a year passed after that before plaintiff sought medical care, indicating that her symptoms were not as bad as she alleged and that doctor visits may have been designed to further her application for benefits as opposed to being necessary to alleviate debilitating pain.

## 4. *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION*

In June 2005 when plaintiff's MRI revealed partial lumbarization of S1, disc desiccation at L4-5 and L5-S1, and minimal broad-based disc bulge at L5-S1 with moderate right foraminal stenosis, the treatment was very conservative --

ibuprofen (a non-steroidal anti-inflammatory) and Skelaxin (a muscle relaxer).

Three weeks after plaintiff first started taking Cymbalta, she reported that her depressive symptoms had improved. Three weeks after that, she reported that her depressive symptoms and anxiety had improved greatly with Cymbalta and she was experiencing no side effects. About two months after that, plaintiff reported a "good response" to Cymbalta with no side effects. The following month, she reported responding well to Cymbalta without side effects and also noted that Neurontin was helping her leg pain. A month later, she reported again that she was responding "very well" to Cymbalta. The next day she told another doctor that her mood was under good control with Cymbalta.

About three months later, plaintiff reported improved sleep and less severe and frequent leg pain. The following week she reported responding well to Cymbalta with no side effects. Plaintiff was prescribed Lyrica for fibromyalgia with "excellent results."

The evidence in the record establishes that plaintiff's medications worked well, her dosages were not changed frequently, and she suffered no side effects. This factor supports the ALJ's credibility finding.

## 5. FUNCTIONAL RESTRICTIONS

As the ALJ mentioned, no doctor has restricted plaintiff's activities. Dr. Borden, plaintiff's rheumatologist, found plaintiff could lift and carry 25 pounds occasionally and ten pounds frequently, stand or walk for one hour at a time and four hours total and sit for three hours at a time and eight hours total during an eight-hour work-day, provided she was allowed to alternate between sitting and standing. She found that plaintiff could occasionally climb, balance, stoop, kneel, crouch, and bend and that she had no manipulative, environmental, or push and pull limitations.

Dr. Stevens found that plaintiff could understand, remember, and carry out even complex tasks or routines, or make even complex work-related decisions without excessive increased supervision within normal tolerances on a sustained basis. She found that plaintiff could deal with routine changes and respond appropriately to supervision, co-workers, and usual work situations in simple, moderately complex, or complex work settings within normal tolerances on a sustained basis.

This factor supports the ALJ's credibility determination.

## B. CREDIBILITY CONCLUSION

The above <u>Polaski</u> factors clearly support the ALJ's finding that plaintiff's allegations of disabling symptoms are not

credible.  In addition, the record is replete with "normal" test results and findings:  In July 2005, plaintiff's x-rays were "totally normal."  She had normal range of motion in her neck and "absolutely full" range of motion in her back.  In September 2005, plaintiff's needle electromyography and nerve conduction studies were normal.  In October 2005 Dr. Lewis found no severe psychological impairment.  In January 2007 plaintiff's mental status exam was within normal limits.  In February 2007 her mental status exam was within normal limits.  In March 2007 her mental status exam was within normal limits.  In April 2007 her mental status evaluation was within normal limits.  In May 2007 her mental status exam was within normal limits.

Plaintiff did not complain of physical pain symptoms after her October 2005 denial of disability benefits until June 2007 when she began complaining of pain in her legs, back, arms, hips, knees, and shoulders.  Coincidentally, plaintiff's notice of her upcoming administrative hearing was sent to her in June 2007.  Despite complaints of neck pain, x-rays of plaintiff's cervical spine were normal.  In August 2007 plaintiff's mental status exam was within normal limits.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that

plaintiff's subjective complaints of disabling symptoms are not credible.

## VII. OPINION OF TREATING PHYSICIANS

Plaintiff argues that the ALJ erred in failing to give controlling weight to the opinion of Dr. Raphel that plaintiff cannot:

> Understand, remember, and carry out complex, moderately complex, or simple tasks, simple routine or simple repetitive tasks within normal tolerances on a sustained basis.

> Make complex, moderately complex or simple work related decisions without excessive increased supervision within normal tolerances on a sustained basis.

> Respond appropriately to supervision, co-workers and usual work situations in a complex, moderately complex or simple work setting within normal tolerances on a sustained basis.

> Deal with routine changes in a complex, moderately complex, or simple routine work setting within normal tolerances on a sustained basis.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion: (1) the length of

36

the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. § 404.1527(d)(2) - (5).

The ALJ had this to say about Dr. Raphel:

Jose Raphel, M.D., a psychiatrist, began seeing the claimant in December 2006, over two years since her alleged onset of disability. On December 18, 2006, he noted that she appeared anxious and depressed and diagnosed depressive disorder, not otherwise specified, and partner relational problems. At that time, Dr. Raphel opined that the claimant had a Global Assessment of Functioning score of 54, indicating that her symptoms were moderate. On July 19, 2007, he completed a "Medical Source Statement." In this form, he indicated that claimant has . . . the ability to understand, remember and carry out simple instructions, to use judgment in making simple work related decisions, and to respond appropriately to supervision, coworkers and usual work situations.

On the other hand, he indicated that she did not have the ability to "deal with changes in a routine work setting, maintain persistence and pace on simple tasks, and get to work regularly and remain at the workplace for a full day." Standing alone, these conclusions indicate an inability to sustain employment. However, they are not explained by reference to any clinical findings, test results or measurements, and give no indication of how Dr. Raphel arrived at such conclusions. Such conclusions, even of a treating source cannot control the decision in a case without some evidentiary basis. Otherwise the matter remains speculative. The Medical Source Statement form further complicates matters, in that it calls for a check list of mental functioning, wherein a "moderate" impairment is one "which *affects* an individual's ability to function on a regular basis" and a "marked" impairment is one "which *seriously affects* the claimant's ability to function. . ." Where the medical source chooses to indicate that a function is "moderately" limited, it is a choice indicating that the

function is not "markedly" limited, or, by definition, that it is "affected" but not "seriously limited."

Dr. Raphel's check marks thus indicate that Ms. Neufeldt's functioning is "affected" but not "seriously limited" as to the ability to perform activities in the area of sustained concentration and persistence, sustained concentration and persistence [sic], and adaptation. These ratings are inconsistent with the preceding conclusions, and draw them into question. Further explanation as to Dr. Raphel's evidentiary basis is necessary, particularly in view of his progress notes which contain entries on most occasions such as "pleasant and cooperative. MSE WNL [mental status exam within normal limits]," and the like. The matter is not clarified in his subsequent form which asks: "What clinical signs, findings, test results, or other non-subjective basis do you rely on to support your conclusion?" In this form Dr. Raphel refers to symptoms of sadness, hopelessness, helplessness and worthlessness. He states that she "has also reported" poor concentration, anger and decreased energy with anhedonia and insomnia." These symptoms are wholly subjective, are not measured, the results of any structured evaluation, and do not provide explanation or rationale for the various conclusions set forth in the forms. In the 7 or 8 months of treatment, Dr. Raphel's notes fail to reflect any structured evaluation. In the spring of 2007 Dr. Raphel noted that the claimant had been prescribed Cymbalta and responded very well to the medication. As of August 30, 2007, his last entry, Dr. Raphel reports: "MSE [mental status examination] essentially WNL [within normal limits]." For this reason, and due to these uncertainties and inconsistencies, a structured evaluation was requested. . . .

[The undersigned gives] little weight to the opinions of Dr. Raphel that [claimant's] mental condition is disabling because the opinions are internally inconsistent and inconsistent with the other medical evidence of record, including the opinion of Dr. Stevens, Dr. Raphel's own observation that the claimant responded well to Cymbalta and the claimant's statement to Dr. Griggs that her mood was under good control with that medication.

(Tr. at 23-25).

*Length of treatment relationship/frequency of examinations.*
Plaintiff did not begin treatment with Dr. Raphel until December
2006 -- two and a half years after her alleged onset date.  She
saw Dr. Raphel eight times before he completed the Medical Source
Statement at issue (July 19, 2007).

*Nature and extent of treatment relationship.* Plaintiff saw
Dr. Raphel for treatment of her depression and anxiety.

*Supportability by medical signs and laboratory findings.*
The ALJ found that Dr. Raphel's opinion was not supported by
medical signs or laboratory findings.  As the ALJ pointed out,
the Medical Source Statement itself is unclear in that "moderate"
limitation is defined as an impairment which affects an
individual's ability to function "on a regular basis."  A regular
basis could mean once every month, or it could mean once every
hour.  The ALJ clearly expressed his frustration with the form
due to this vague definition (Tr. at 445-450), as did the
vocational expert (Tr. at 439-440).

Dr. Raphel's original Medical Source Statement did not
include any support for his findings.  The ALJ requested
additional information from Dr. Raphel.  The form specifically
asked for clinical signs, findings, test results or other non-
subjective bases for Dr. Raphel's conclusions.  Instead of
listing any of these things, Dr. Raphel noted that plaintiff is

being treated for depression and anxiety; that she has experienced sadness, hopelessness, helplessness, and worthlessness; and that she has reported poor concentration, anger, and decreased energy. These factors are totally subjective.

In addition to Dr. Raphel failing to list any clinical signs, findings, test results, or any other non-subjective bases for his opinion, the opinion in the Medical Source Statement is completely contradicted by Dr. Raphel's own medical records. In December 2006 Dr. Raphel's medical records list nothing more than plaintiff's subjective complaints of hopelessness, worthlessness, helplessness, sadness, tension, anger, feeling stressed and lonely, low energy, and poor concentration. Dr. Raphel observed that plaintiff was "very pleasant, cooperative and appropriate" during the interview. He performed a mental status exam and found that she was oriented times four; there was no evidence of psychosis or thought disorder; her memory for immediate, recent, and remote events was within normal limits; her judgment and insight were fair; and her fund of knowledge was appropriate for her educational level. He assessed depressive disorder and partner relational problems.

In the records covering the months leading up to completion of the Medical Source Statement, Dr. Raphel performed no

additional tests other than mental status exams which were noted to be within normal limits. He noted that plaintiff was pleasant and cooperative, her depressive symptoms and anxiety had improved greatly with medication, and her mood was brighter. Plaintiff reported that she was responding "very well" to her medication and experienced no side effects. The only negative reference in Dr. Raphel's records was to an increase in depressive symptoms after plaintiff had been out of her medication for a couple weeks.

There simply are no medical signs or laboratory findings supporting Dr. Raphel's opinion; and his own medical records contradict the opinion in the Medical Source Statement.

***Consistency of the opinion with the record as a whole.*** The ALJ observed that Dr. Raphel's opinion is not only inconsistent with his own medical records, it is inconsistent with the record as a whole. The month before the Medical Source Statement was completed, plaintiff told Dr. Joshua Griggs that her anxiety and depression were controlled with Cymbalta. Dr. Lewis found that plaintiff had no severe mental impairment; no restrictions of activities of daily living; no difficulties in maintaining social functioning; no difficulties maintaining concentration, persistence, or pace; and no episodes of decompensation. Dr. Stevens found that plaintiff's emotional symptoms did not

restrict her activities.  She noted that plaintiff had an ability to apply insight and social skills, memory function and mental control were adequate, pace and persistence of responding were adequate, and she was able to complete routine tasks. "Psychological symptoms appear to be related to physical complaints, but do not significantly restrict [plaintiff]."

In addition to Dr. Raphel's opinion contradicting the other medical evidence in the record, it contradicts plaintiff's own report of her limitations.  In a Function Report signed by plaintiff on August 29, 2005 -- more than 15 months after her alleged onset date -- plaintiff reported that she could pay attention as long as needed, she finishes what she starts, she has no problems following any instruction, and has no problems getting along with authority figures.  She also reported that she handles changes in routine "fine."

There is nothing in the medical records of any other treating or consulting source which supports the findings of Dr. Raphel in his Medical Source Statement.

**_Specialization of the doctor._**  Dr. Raphel is a psychiatrist.

Because plaintiff's mental status exams were normal every time she saw Dr. Raphel, she responded well to her medication without side effects, and no medical record (not Dr. Raphel's or any other medical professional's) supports the limitations that

appear in Dr. Raphel's Medical Source Statement, I find that the
substantial evidence in the record as a whole supports the ALJ's
decision to give little if any weight to the opinion of Dr.
Raphel as set out in the Medical Source Statement.

### VIII. DR. MIRIAM BORDEN

Plaintiff argues that Dr. Borden, a rheumatologist, found
that plaintiff would need to alternate sitting and standing.
"Based on the need to alternate sitting and standing alone, the
Administrative Law Judge should have found Claimant disabled
under SSR 83-12." Plaintiff then quotes from a portion of SSR
83-12:

> That Rule reads in part that in some claims a Claimant is
> given restrictions, which lead to "either sedentary or light
> work except that the person must alternate periods of
> sitting and standing. The individual may be able to sit for
> time, but must then get up and stand or walk for a while
> before returning sitting. Such an individual is not
> functionally capable of doing either the prolonged sitting
> contemplated in the definition of sedentary work. . . or the
> prolonged standing or walking contemplated for most light
> work".

However, plaintiff neglected to quote the remainder of SSR 83-12:

> There are some jobs in the national economy -- typically
> professional and managerial ones -- in which a person can
> sit or stand with a degree of choice. If an individual had
> such a job and is still capable of performing it, or is
> capable of transferring work skills to such jobs, he or she
> would not be found disabled. However, most jobs have
> ongoing work processes which demand that a worker be in a
> certain place or posture for at least a certain length of
> time to accomplish a certain task. Unskilled types of jobs
> are particularly structured so that a person cannot
> ordinarily sit or stand at will. In cases of unusual

limitation of ability to sit or stand, a VS [vocational specialist] should be consulted to clarify the implications for the occupational base.

In this case, the ALJ followed the dictates of SSR 83-12 by consulting a vocational expert who testified that a person with the residual functional capacity found by the ALJ -- which includes the need to sit and stand at will -- could perform other work in significant numbers in the economy.  The hypothetical included all credible limitations.  See Guilliams v. Barnhart, 393 F.3d 798, 804 (8th Cir. 2005) (vocational expert testimony, in the form of a response to a hypothetical question posed by the ALJ, constitutes substantial evidence supporting the Commissioner's decision, provided the ALJ's hypothetical includes all of claimant's credible physical and mental impairments).  Therefore, plaintiff's motion for summary judgment on this basis will be denied.

## IX.  CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 13, 2010